United States District Court
Southern District of New York

1:20-cv-00888-JMF

Magdiela Gonzalez and Rita Bongiovi,
individually and on behalf of all others
similarly situated,

Plaintiffs,

- against -

Gojo Industries, Inc.,

Defendant

First Amended
Class Action Complaint

Plaintiffs, by their under-signed attorneys, allege as follow upon information and belief, except for allegations pertaining to Plaintiffs, which are based on personal knowledge:

1.  Gojo Industries, Inc. ("Defendant") manufactures, distributes, markets, labels and sells topical antiseptic products consisting primarily of ethyl alcohol under the Purell brand and Advanced Hand Sanitizer product line which includes gels and foams ("Products") .

2.  The Products are available to consumers from retail and online stores of third-parties and Defendant's website and are sold in various sizes including 12 OZ (354 ML).

3.  The Products contain substantially similar representations on the labels including "2X Sanitizing Strength*: 1 squirt PURELL Advanced = 2 squirts Other National Brands," "Advanced Hand Sanitizer," "Kills 99.99% of Illness Causing Germs," "Refreshing Gel" and "Leaves Hands Feeling Soft."

4.  An image of the Products is immediately below:

1



5.      The Products' website and social media accounts contains additional representations attesting to their ability to prevent colds, flu and promote educational achievement.

I.      **Defendant Markets and Advertises the Product as Preventing Infection and Reducing Illness from the Flu and Other Viruses**

6.      Defendant advertises, markets, and sells the Products online through its own website, social media pages, and third-party webpages as preventing disease, including the flu and other viruses.

7.      Flu season is Defendant's time to make money, as the Vice President of Marketing for GoJo said in a 2004 article in AdAge.com: "'We have been seeing an impact on our Purell

2

sales [due to the vaccine shortage] and we expect that to continue,' said Sandy Katz, VP-marketing

of Gojo. 'It's similar to what we saw during the SARS outbreak last year.'"

      8.     However, the Food and Drug Administration ("FDA") recently issued a warning

letter to Defendant which detailed Defendant's false, deceptive and dangerous marketing of the

Products, as described immediately below.[1] (the "Warning Letter")(See Warning Letter, Exhibit

A.):

| General Claim | Specific Quotations from Defendant's Marketing Materials and Website |
|---|---|
| Germs | • Kills more than 99.99% of most common germs that may cause illness in a healthcare setting, including MRSA & VRE |
| Candida auris | **Candida auris in the Healthcare Setting**<br>• To help prevent transmission, hand hygiene with an alcohol-based hand sanitizer is recommended along with hand washing if hands are soiled. PURELL® Advanced Gel, Foam, and Ultra-Nourishing Foam Hand Sanitizer products demonstrated effectiveness against a drug resistant clinical strain of Candida auris in lab testing. |
| 100% MRSA & VRE Reduction | **PURELL® Products Help Eliminate MRSA & VRE**<br>• 100% MRSA & VRE Reduction[] . . . A recent outcome study shows that providing the right products, in a customized solution, along with educational resources for athletes and staff can reduce MRSA and VRE by 100%[] |
| Educational Outcomes/Truancy | **The PURELL SOLUTION™ for Education**<br>• 51% Reduced Student Absenteeism<br>• PURELL® products have proven results in delivering positive health outcomes. |

---

[1] FDA, Warning Letter to Gojo Industries, Inc., January 17, 2020, MARCS-CMS 599132.

- Illness causes 144 million lost school days each year.
- In a recent study, student absenteeism was reduced by 51% when PURELL hand hygiene products were used in conjunction with a curriculum to teach kids about good hand hygiene[] . . .
- 10% Less Teacher Absenteeism . . . PURELL® Products Help Teachers Stay Well . . .
- New teachers are particularly more susceptible to student borne illness[].
- In one study, schools that combined hand-hygiene education with PURELL® products reduced teacher absenteeism by 10%[].
- PURELL® Products are Proven to Reduce Absenteeism
- On average, illness causes 144 million lost school days each year[] and missing school can have a significant effect on a student's performance.
- Research has shown that when used alongside a curriculum to teach students about hand hygiene, PURELL® products can reduce student absenteeism by up to 51%[].
- Additionally, teachers who follow this program also experience a 10% reduction of absenteeism[].

Common Colds

- PURELL® Products Help Eliminate MRSA & VRE . . . 100% MRSA & The PURELL SOLUTION™ has the products you need to help prevent the spread of infection this germ season.

### Illness Outbreak

Ebola virus, norovirus, and influenza

- What Steps Can I Take to Prevent the Spread of Norovirus?
- Even though norovirus is highly contagious, there are ways you can reduce the risk of its spread.
- According to the Centers for Disease Control and Prevention, follow these steps to reduce the spread of the virus.
- 1. Practice good hand hygiene. Make sure to wash your hands with

4

soap and water at key moments, especially after using the restroom since the virus can spread through stool.

- Alcohol-based hand sanitizers with at least 60% alcohol can be used in addition to handwashing. . .
- Are PURELL® Hand Sanitizer products effective against the flu?
- The FDA does not allow hand sanitizer brands to make viral claims, but from a scientific perspective, influenza is an enveloped virus. Enveloped viruses in general are easily killed or inactivated by alcohol.
- The World Health Organization (WHO) and the Center for Disease Control and Prevention (CDC) are recommending the use of alcohol-based hand sanitizer as a preventive measure for flu prevention"
- Is PURELL® Advanced Hand Sanitizer Effective Against Ebola?.
- As of today, we are not aware of any hand sanitizers that have been tested against Ebola viruses, including PURELL® Advanced Hand Sanitizer.
- However, it is important to note that the Ebola virus is an enveloped virus. Enveloped viruses in general are easily killed or inactivated by alcohol.
- World Health Organization (WHO) and the Center for Disease Control and Prevention (CDC) are recommending the use of alcohol-based hand sanitizer as a preventive measure during this outbreak . . .

## II.    Defendant's Marketing and Advertising Is Misleading

9.    There is no evidence that defendant's Products prevent the flu and other viruses or reduce infection from the flu and other viruses.

10.    As it pointed out in the Warning Letter, the "FDA is currently not aware of any adequate and well-controlled studies" supporting such a representation.

11.    By identifying specific pathogens, like the flu and other viruses, Defendant is

misleading consumers into thinking that the Products will prevent infection from those pathogens.

12.     Additionally, Defendant's statement that the Products kill 99.99% of germs, which means bacteria and viruses, is misleading when combined with Defendant's marketing and advertising about preventing infection and reducing illness from the flu and other viruses because there is no valid evidence that the Products actually prevent infection and reduces illness by killing bacteria and viruses.

13.     Defendant connects its label statement that the Products kill 99.99% of germs with its pathogen specific claims about the flu through images and words in its advertising and on social media. See Exhibit B, Defendant's Website Screenshots,  Exhibit C, Defendant's Twitter Account

14.     The label statement is connected to the misrepresentations about preventing infection from the flu and other viruses because Defendant knows that consumers purchase the Products not just to kill 99.99% of bacteria and viruses without reason, but specifically to kill 99.99% of bacteria and viruses to prevent infection from those viruses.

15.     The FDA stated that Defendant's statements regarding the efficacy of the Products to combat Ebola, norovirus, influenza, absenteeism and common colds indicate the Products are "intended for the diagnosis, cure, mitigation, treatment, or prevention of disease, and/or under section 201(g)(1)(C) of the FD&C Act, 21 U.S.C. 321(g)(1)(C), because they are intended to affect the structure or any function of the body."[2]

---

[2] Id.

III.    **Scientific Studies Show Not Only an Absence of Evidence Supporting Claims but Affirmatively Question the Efficacy of Hand Sanitizer**

16.    Defendant maintains that the Products kill 99.99% of germs.

17.    As the FDA noted, whether or not the Products kill a germ at some percentage has not been clinically proven to lead to a reduction in illness.

18.    While the Warning Letter stated that the FDA was not aware of any reliable, well controlled studies showing that hand sanitizer leads to a clinical reduction in infections from the flu or other viruses, there are scientific studies and articles that call into question the effectiveness of hand sanitizer in a practical setting and/or in general.  For example:

i.      Ryohei Takaaki Nakaya, Yuji Naito, Tomo Daidoji, Risa Bandou, Ken Inoue, Osamu Dohi, Naohisa Yoshida, Hideyuki Konishi, Yoshito Itoh.  *Situations Leading to Reduced Effectiveness of Current Hand Hygiene against Infectious Mucus from Influenza Virus-Infected Patients*.  mSphere; DOI: 10.1128/mSphere.00474-19 (flu virus in wet mucus not inactivated after twenty seconds of exposure to hand sanitizer or even after two minutes but only after four minutes, unlike shorter times for dry mucus or mucus in saline solution);

ii.     Allison E. Aiello, PhD, Rebecca M. Coulborn, BS, Vanessa Perez, MS, and Elaine L. Larson, PhD, RN.  *Effect of Hand Hygiene on Infectious Disease Risk in the Community Setting: A Meta-Analysis*.  Am J Public Health. 2008 August; 98(8): 1372–1381 (surveying multiple studies, authors were surprised, that "the use of alcohol-based hand sanitizers combined with hand-hygiene education was not strongly associated with reduced rates of gastrointestinal illnesses or respiratory illnesses");

iii.    Thomas J. Sandora, Mei-Chiung Shih and Donald A. Goldmann.  *Reducing Absenteeism From Gastrointestinal and Respiratory Illness in Elementary School Students: A Randomized, Controlled Trial of an Infection-Control Intervention*.  Pediatrics June 2008, 121 (6) e1555-e1562 (absenteeism for respiratory infections not affected by hand sanitizer use);

iv.     Thomas J. Sandora, Elsie M. Taveras, Mei-Chiung Shih, Elissa A. Resnick, Grace M. Lee, Dennis Ross-Degnan and Donald A. Goldmann.  *A Randomized, Controlled Trial of a Multifaceted Intervention Including Alcohol-Based Hand Sanitizer and Hand-Hygiene Education to Reduce Illness Transmission in the Home*.  Pediatrics September 2005, 116 (3) 587-594 (absenteeism for respiratory infections not affected by hand sanitizer use);

v.      Blaney DD, Daly ER, Kirkland KB, Tongren JE, Kelso PT, Talbot EA. *Use of alcohol-based hand sanitizers as a risk factor for norovirus outbreaks in long-term care facilities in northern New England*: December 2006 to March 2007. Am J Infect Control. 2011 May;39(4):296-301 (concluding that health providers that preferred hand sanitizer might be more likely to cause a norovirus outbreak);

vi.     Charbonneau DL, Ponte JM, Kochanowski BA. *A method of assessing the efficacy of hand sanitizers: use of real soil encountered in the food service industry*. J Food Prot. 2000 Apr;63(4):495-501 (finding that use of soap and water was more effective at removing bacteria from hands than using 70% alcohol hand sanitizer);

vii.    Kampf G, Marschall S, Eggerstedt S, Ostermeyer C. *Efficacy of ethanol-based hand foams using clinically relevant amounts: a cross-over controlled study among healthy volunteers*. BMC Infect Dis. 2010 Mar 26;10:78 ("When using 62% ethanol foams, the time required for dryness often exceeds the recommended 30 s.  Therefore, only a small volume is likely to be applied in clinical practice. Small amounts, however, failed to meet the efficacy requirements of EN 1500 and were only somewhat more effective than water.").

19.    Moreover, while Defendant refers to the CDC guidelines, it omits from those references any disclosure that John M. Boyce, M.D., who was the chairperson of the CDC's hand hygiene task force, received Research and educational grants from defendant, an honorarium from Procter and Gamble, and is a consultant to Bode Chemical.

20.    Only clicking through a series of links on the CDC's website reveals this fact.[3]

21.    Defendant also fails to disclose this relationship when it refers to WHO guidelines, despite Dr. Boyce being "a member of the core group that developed the WHO Guideline for Hand Hygiene in Healthcare."[4]

---

[3] https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5116a2.htm
[4] https://www.shea-online.org/index.php/membership/member-spotlights/255-john-m-boyce-md

IV.     **Defendant Knew Its Representations Were False, Misleading, and Dangerous**

22.     Defendant knew that it should not be making claims about the flu or other viruses.

23.     Defendant called out a competitor for making pathogen specific claims, including claims about the flu, and even suggested that the FDA bring criminal claims against the competitor. See *USA v. Innovative BioDefense, Inc.*, Case No. 8:18-cv-00996-DOC-JDE (C.D.Cal.). See Exhibit D, May 4, 2020 Findings of Fact and Conclusions of Law, pp.15-17.

24.     Defendant recently found itself involved in the federal government's prosecution of one of Defendant's Competitors in *USA v. Innovative BioDefense, Inc.*, Case No. 8:18-cv-00996-DOC-JDE (C.D.Cal.).

25.     The competitor argued that Defendant mounted a campaign against it and hounded the FDA into prosecuting it for the same type of pathogen specific claims that Defendant makes about its own hand sanitizer

26.     In that case, while reaching a decision about Defendant's competitor, the Court also found that "GOJO's website contained several examples of pathogen-specific statements regarding its products" and Defendant's counsel admitted at his deposition in October 2019 that Defendant's statements about Purell products were improper and in violation of FDA regulations.

27.     Additionally, the Court found that:

>    i.     Defendant's counsel continued to aggressively pressure the FDA to take action against a competitor's products throughout 2015;
>
>    ii.    Defendant's counsel left the FDA a voicemail threatening to take his complaints about the competitor "higher up in the agency;"
>
>    iii.   Defendant's counsel wrote the FDA demanding that the FDA take "prompt and decisive regulatory action" against the competitor;
>
>    iv.    Defendant's counsel wrote FDA urging the FDA to launch a criminal investigation into the competitor;

v.     Defendant's counsel left a voicemail for the FDA, about the competitor, stating, "You've really got to do something to stop it;"

vi.     Defendant's counsel wrote FDA urging "prompt and vigorous action" against the competitor;

vii.     Defendant's counsel admitted, after reviewing several of Defendant's website statements, that "If these are on their website, the U.S. website or in the U.S., they would not be in compliance;" and

viii.     Defendant's counsel stated that an advertisement for Purell that states, "Kills more than 99 percent of most common germs that may cause illness in a healthcare setting, including MRSA and VRE" was improper.

28.     In one of the letters authored by Defendant's counsel, he highlighted that the competitor made pathogen specific claims, including claims about the flu, asked the FDA to stop the competitor, and explained that such action was necessary to "protect public health." Exhibit E, Letter.

29.     Indeed, noting the FDA's prosecution against the competitor and the lack of prosecution against defendant for substantially the same conduct, the Court stated: "as this Court has already made clear, the circumstances surrounding the lack of enforcement against GOJO Industries is troubling, and the Court is of the opinion that the disparities in enforcement should be addressed expeditiously."

30.     Accordingly, Defendant knew, or in the exercise of reasonable care, should have known that its Product's label, marketing, and advertising materials were misleading or false and that making pathogen specific claims, like its claim about preventing infection from the flu and other viruses, should be stopped to protect public health.

31.     Moreover, Defendant knew that customers purchased its Product for personal use.

**V.    The Products Are Marketed as Drugs but Lack Approval from the FDA.**

32.    The FDA has never established that the Products' main ingredient, ethyl alcohol, is generally recognized as safe and effective for its intended use (GRASE) for antiseptic uses.

33.    The Products' claims are beyond those permitted for topical antiseptics which the FDA has allowed.

34.    No topical antiseptic products have ever been able to achieve the results Defendant advertises as such outcomes are beyond the ability of ethyl alcohol solution.

35.    Defendant's claims are harmful and deceptive to consumers because they give the impression that using the Products is sufficient to prevent the above-described diseases and illnesses.

36.    When consumers believe Defendant's claims, they are less likely to engage in other precautionary and preventive behavior which actually will prevent transmission of these diseases.

37.    Defendant's unqualified claims with respect to absenteeism gives parents the message that regardless of specific reasons their children may have missed school, use of the Products would be able to reduce their missed days by half.

38.    Defendant's invocation of the Ebola virus is intended to demonstrate the potency of the Products.

39.    Defendant stops short of disclaiming the Products' efficacy in preventing or curing Ebola, but couches its response in qualifying language: "As of today, we are not aware of any hand sanitizers that have been tested against Ebola viruses."

40.    In other words, the Products are effective enough that *if* there was testing of hand sanitizers against Ebola, the Products *could* prevent Ebola.

41.    While the average American has almost a zero chance of ever contracting "Ebola,"

its mention is shorthand to describe the most horrific and fatal disease in existence.

42.     Even *if* the Products may not be effective against Ebola, the logic goes, consumers could reasonably expect the Products to be effective at preventing diseases less serious than Ebola, which would include practically every other known disease.

43.     The recent outbreak of the fatal Coronavirus has prompted increased demand for the Products.

44.     According to some reports, defendant has promoted the Products as a viable means of preventing transmission of Coronavirus.

45.     The Products are unable to provide the outcomes promised by defendant, but through their representations, cause consumers to defer or forgo taking other concrete measures at preventing disease and illness, thereby increasing their chances of contracting same.

## VI.     Conclusion

46.     Defendant's branding and marketing of the Products is designed to – and did – deceive, mislead, and defraud consumers.

47.     Defendant's false, deceptive, and misleading marketing of the Products has enabled defendant to sell more of the Products and at higher prices per unit, than it would have in the absence of this misconduct.

48.     This results in additional profits to defendant at the expense of consumers and consumers' greater susceptibility to disease, illness and other more mundane causes of absenteeism, like staying up late at night.

49.     The value of the Products that Plaintiffs actually purchased and used was materially less than its value as represented by defendant.

50.     Had Plaintiffs and class members known the truth, they would not have bought the

Products or would have paid less for it, and would not have forgone or deferred proven, medically established recommendations to prevent transmission of disease and illness.

51.     The Products contains other representations which are misleading and deceptive.

52.     As a result of the false and misleading labeling, the Products are sold at a premium price, approximately no less than $2.99 per 12 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<strong><u>Jurisdiction and Venue</u></strong>

53.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

54.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

55.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

56.     This is a reasonable assumption because the Products are available throughout New York State at thousands of brick-and-mortar stores, from convenience to grocery.

57.     Plaintiffs Magdiela Gonzalez and Rita Bongiovi are citizens of New York.

58.     Defendant is an Ohio corporation with a principal place of business in Cuyahoga Falls, Summit County, Ohio and is a citizen of Ohio.

59.     This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

60.     Venue is proper because Plaintiffs and many class members reside in this District

and defendant does business in this District and State.

61.   A substantial part of events and omissions giving rise to the claims occurred in this District.

## Parties

62.   Plaintiff Gonzalez is a citizen of Manhattan, New York County, New York.

63.   Plaintiff Gonzalez purchased the Products in New York County in 2019 and 2020 because she saw and relied upon the representations that it killed 99.9% of germs in addition to the other statements identified herein.

64.   Plaintiff Bongiovi is a citizen of Yonkers, Westchester County, New York.

65.   Plaintiff Bongiovi purchased the several varieties of the Products including travel size and pump bottles approximately four times per year for at least the past six years, including multiple times during 2020.

66.   Plaintiff Bongiovi purchased them at CVS, Walgreens, Stop and Shop Supermarket and Amazon.com, among other places.

67.   Plaintiff Bongiovi purchased the Products because she saw and relied on the representations that it killed 99.9% of germs in addition to the other statements identified herein.

68.   Plaintiff Bongiovi purchased the Products to provide for her children at their school, to keep in her car and to carry on her person.

69.   The Product's claim that it kills over 99% of germs caused Plaintiff Bongiovi to purchase the Products.

70.   Based on the Product's advertisements described herein, Plaintiff Bongiovi chose to purchase Purell Products instead of other, lower priced sanitizers.

71.   Plaintiffs Gonzalez and Bongiovi would not have purchased the Products if they had

14

known it did not kill 99% of germs, including the flu.

72.    Defendant Gojo Industries, Inc. is a Ohio corporation with a principal place of business in Cuyahoga Falls, Ohio, Summit County.

73.    During the relevant statutes of limitations, Plaintiffs purchased and used Defendant's Products within this district and/or State in reliance on defendant's marketing materials.

## Class Allegations

74.    The class consists of all New York residents who purchased the Products in New York State during the applicable statutes of limitations ("Class" or "New York Class").

75.    Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if Plaintiffs and class members are entitled to damages.

76.    Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive actions.

77.    Plaintiffs are adequate representative because their interests do not conflict with other members.

78.    No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

79.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

80.    Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

81.    Plaintiffs seek class-wide injunctive relief because the practices continue.

15

## CLAIMS

## COUNT I

## VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiffs and New York Class Members)**

82.    Plaintiffs incorporate by reference all preceding paragraphs.

83.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

84.    The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiffs and New York Class Members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting the Products.

85.    Plaintiffs and class members desired to purchase products which were as described and marketed by Defendant and expected by reasonable consumers, given the product type.

86.    Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

87.    Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because it gives the impression to consumers the Products are effective at preventing colds, flu, absenteeism and promoting bodily health and increased academic achievement.

88.    However, when consumers use the Products as intended, they are lulled into a false sense of security as to other scientifically proven measures they should take to achieve the outcomes promoted by Defendant.

16

89.     Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known and would not have foregone or deferred taking proven steps at achieving the outcomes promoted by defendant, suffering damages.

90.     Defendant's advertising and products' packaging and labeling induced the Plaintiffs and New York Class Members to buy Defendant's Products and to pay a premium price for them.

91.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class have been damaged thereby.

92.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Class Members are entitled to monetary and compensatory damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

93.     Plaintiff and Class Members seek actual damages under GBL § 349, as well as statutory damages of $50 per unit purchased pursuant to GBL § 349.

## COUNT II

### VIOLATION OF NEW YORK GBL § 350
**(On Behalf of Plaintiffs and New York Class Members)**

95.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing

paragraphs as if fully set forth herein.

96.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce
> or in the furnishing of any service in this state is hereby declared
> unlawful.

97.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or
> of the kind, character, terms or conditions of any employment
> opportunity if such advertising is misleading in a material respect.
> In determining whether any advertising is misleading, there shall be
> taken into account (among other things) not only representations
> made by statement, word, design, device, sound or any combination
> thereof, but also the extent to which the advertising fails to reveal
> facts material in the light of such representations with respect to the
> commodity or employment to which the advertising relates under
> the conditions proscribed in said advertisement, or under such
> conditions as are customary or usual . . .

98.     Defendant's labeling and advertisements contain untrue and materially misleading

statements concerning Defendant's Products as described above.

99.     Plaintiffs and New York Class Members have been injured inasmuch as they relied

upon the labeling, packaging and advertising and paid a premium for the Products.   Accordingly,

Plaintiff and New York Class Members received less than what they bargained or paid for.

100.   Defendant's advertising, packaging and product labeling induced the Plaintiffs and

Class Members to buy Defendant's Products.

101.   Defendant made its untrue and misleading statements and representations willfully,

wantonly, and with reckless disregard for the truth.

102.   Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

103.   Defendant made the material misrepresentations described in this Complaint in Defendant's advertising, and on the Products' packaging and labeling.

104.   Defendant's material misrepresentation was substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

105.   As a result of Defendant's recurring deceptive acts and practices, Plaintiffs and New York Class Members are entitled to monetary and compensatory damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.  Plaintiff and New York Class members also are entitled to statutory damages of $500 per unit purchased.

## COUNT III

## NEGLIGENT MISREPRESENTATION

### (On Behalf of Plaintiffs and New York Class Members)

106.   Plaintiffs incorporate by reference all preceding paragraphs.

107.   Defendant's marketing and advertising gives the impression to consumers the Products are effective at preventing colds, flu, absenteeism and promoting bodily health and increased academic achievement.  However, when consumers use the Products as intended, they are lulled into a false sense of security as to other scientifically proven measures they should take to achieve the outcomes promoted by defendant.

108.   Defendant had a duty to disclose and/or provide non-deceptive marketing of the

19

Products and its intended uses, and knew or should have known same were false or misleading.

109.   This duty is based on Defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

110.   The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

111.   Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

112.   Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known and would not have foregone or deferred taking proven steps at achieving the outcomes promoted by defendant, suffering damages.

## COUNT IV

## BREACHES OF NEW YORK'S IMPLIED WARRANTY OF MERCHANTABILITY AND MAGNUSON MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *ET SEQ.*

### (On Behalf of Plaintiffs and New York Class Members)

113.   Plaintiffs incorporate by reference all preceding paragraphs.

114.   Defendant gives the impression to consumers the Products are effective at preventing colds, flu, absenteeism and promoting bodily health and increased academic achievement. However, when consumers use the Products as intended, they are lulled into a false sense of security as to other scientifically proven measures they should take to achieve the outcomes promoted by defendant.

115.  The Products warranted to Plaintiffs and class members that they possessed preventive and other positive capabilities they did not.

116.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

117.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

118.  Plaintiffs provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

119.  Defendant had received or should have been aware of the misrepresentations due to numerous complaints by consumers and the FDA to its main office over the past several years.

120.  The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

121.  Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known and would not have foregone or deferred taking proven steps at achieving the outcomes promoted by defendant, suffering damages.

## COUNT V

## FRAUD

### (On Behalf of Plaintiffs and New York Class Members)

122.  Plaintiffs incorporate by references all preceding paragraphs.

123.  Defendant's marketing gives the impression to consumers the Products are effective at preventing colds, flu, absenteeism and promoting bodily health and increased academic achievement.  However, when consumers use the Products as intended, they are lulled into a false sense of security as to other scientifically proven measures they should take to achieve the

21

outcomes promoted by Defendant.

124.  Defendant's fraudulent intent is evinced by the outrageousness of its claims and the seriousness of the issue – preventing colds and flu – and defendant's knowledge that in relying on its claims, consumers would fail to seek treatment when they otherwise should have and take measures backed by the scientific and medical community to achieve the desired outcomes.

125.  Plaintiffs and Class Members would not have purchased the Products or paid as much if the true facts had been known and would not have foregone or deferred taking proven steps at achieving the outcomes promoted by defendant, suffering damages.

## COUNT VI

### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and New York Class Members)**

126.  Plaintiffs incorporate by reference all preceding paragraphs.

127.  Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiffs and class members, who seek restitution and disgorgement of inequitably obtained profits.

## PRAYER FOR RELIEF

 **WHEREFORE**, Plaintiffs pray for judgment:

- Declaring this a proper class action, certifying Plaintiffs as class representatives and undersigned as counsel for the class;

- Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

- Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, restitution and disgorgement for members of the class;


- Awarding monetary damages and interest, including treble damages, pursuant to the claims;

- Awarding costs and expenses, including reasonable fees for Plaintiffs' attorneys and experts; and

- Other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues.


Dated:   July 2, 2020

Respectfully submitted,

**REESE LLP**

*/s/ Michael R. Reese*

Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone:  (212) 643-0500
Facsimile:  (212) 253-4272
*mreese@reesellp.com*

**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck, New York 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

*Counsel for Plaintiffs and
the Proposed New York Class*

24